JUDGE CASTEL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

15 CV 03025



Jonathan Shiekman
8 Ashbridge Lane
Linwood, NJ 08221,

                              **Plaintiff,**

        v.

Bjorn Q. Aaserod
146 West 57th Street
Apt 76CD
New York, NY 10019

and

Cynthia Aaserod
146 West 57th Street
Apt 76CD
New York, NY 10019

and

Shyda Gilmer
11 Merestone Terrace
Bronxville, NY 10708

and
Imperial Wine & Spirits
255 W 36th St
Suite 1103
New York, NY 10018

                             **Defendants.**

Case No.

RECEIVED
APR 1 / 2015
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Jonathan Shiekman ("Shiekman") for his complaint against Defendants Imperial Wine & Spirits LLC ("Imperial"), Bjorn Q. Aaserod, Cynthia Aaserod and Shyda Gilmer, states and alleges as follows:

## INTRODUCTION AND SUMMARY OF THE ACTION

1.      This dispute arose after Shiekman's sale of his membership interest in Margate Wine & Spirit LLC ("Margate") to Imperial on October 1, 2014 pursuant to a Membership Interest Purchase Agreement ("Agreement").  Since that sale, under the constant direction of Bjorn Aaserod and his wife, Cynthia Aaserod (collectively, the "Aaserods"), who are the alter egos of Imperial, the Aaserods and Imperial have breached virtually every material term of the Agreement and caused Shiekman to be deprived of the anticipated benefits of the Agreement.

2.      In the March 2014, at the instigation of the managing owner of one of Margate's largest customers, Shyda Gilmer of Sherry-Lehmann Wine & Spirits ("Gilmer"), Shiekman was introduced to Bjorn Aaserod, on information and belief, a citizen of Norway and the holder of a United States Green Card acquired sometime after closing.  Gilmer advised Shiekman that Aaserod would be a terrific partner, had significant financial resources and had a strong interest in expanding Aaserod's fledgling wine business through the acquisition of a long-established importer and wholesaler, like Margate.  At the time, Shiekman understood that

Aaserod owned Imperial.  Shiekman later learned that Imperial was owned in part by Bjorn Aaserod's wife, Cynthia Aaserod, Gilmer and others, through a complex web of trusts and LLC's, apparently designed to avoid New York State Alcoholic Beverage regulations and potentially those of other states and to hide the true owners of the entity.  Gilmer never disclosed that he would personally benefit if Shiekman could reach a deal to sell his business to Imperial.

      3.     Through a series of negotiations facilitated by Gilmer, claiming to act as a disinterested friend of both parties and managing one of Shiekman's largest customer, Bjorn Aaserod and Shiekman entered into the Agreement to govern the October 1, 2014 sale that provides Shiekman with significant financial benefits, including to be paid over a ten-year term the value of his business, more than $2,600,000, a profit sharing arrangement worth at least an additional $1,000,000, repayment or assumption of Margate's outstanding line of credit with Parke Bank that, prior to closing, exceeded $500,000, a salary of $52,000 per year and other significant financial benefits.  All told, Shiekman anticipated a deal worth nearly $5,000,000 at the time of closing.  But after the closing of the transaction, Imperial and the Aaserods, with the help, urging and for the financial benefit of Gilmer and others, repeatedly and materially breached the Agreement by refusing to perform their obligations.

4.      Almost immediately after the closing, Bjorn Aaserod and Gilmer took full control of the business and imposed significant limitations on scope and nature of Shiekman's rights and obligations in conducting the business, including (1) directing Shiekman not communicate with the suppliers, with whom Shiekman had, in some cases, a multi-decade relationship and which were essential to the continued successful future operation of the business, (2) imposed unreasonable and irrational limitations on normal inventory replenishment to the point where Margate cannot now meet customer demand; (3) limited travel so that Shiekman would lose connection with many of Margate's most important customers, with whom Shiekman had a multi-decade relationship, all to seek to deprive him of the benefits of the Agreement, including his profit sharing rights; and (4) failed to act in good faith, despite repeated requests to do so, to establish with Mr. Shiekman written guidelines outlining Mr. Shiekman's authority to act on behalf of the business, the effect of each of which is to impair Mr. Shiekman's financial incentives provided under Agreement and has materially altered the scope and nature of his rights and obligations..

5.      At the same time, Bjorn Aaserod, despite the fact that he put the business in his wife's name, supported by Gilmer, began to fabricate issues concerning Shiekman's performance in an abusive, accusatory and mercurial fashion, notwithstanding the fact that Shiekman was merely continuing to use

commercially reasonable efforts to conduct the business in a manner that was substantially consistent with the manner of operation during, at least, the previous 12 months, as was the full extent of Shiekman's obligation under the Agreement.

6.      Gilmer, on behalf of Imperial, took the responsibility to communicate to Shiekman the fact that Aaserod was upset with the way Shiekman was performing his obligations and that Aaserod was going to sue Shiekman and, effectively, throw him out of the business without having to pay Shiekman any of the agreed purchase price.

7.      Gilmer, who had known Shiekman for at least ten years and claimed to be Shiekman's good friend, knew full well that Shiekman had changed nothing in the manner with which he was operating the business and, while Aaserod may not have liked Shiekman's style, it was the same style with which Shiekman had always conducted the business and that Aaserod's claims were a mere pretext to redo the deal.

8.      In addition, Imperial and the Aaserods, *inter alia*,  (1) drained Margate's funds, (2) failed to pay off the Parke Bank line of credit, causing Jonathan and his wife to be the subject of a lawsuit by Parke Bank seeking to collect the amount due it, (3) made unsupportable and arbitrary claims regarding the value of the pre-closing Margate inventory, (4) required Shiekman to repay Parke Bank a portion of the amount it claimed, (5) failed to pay Shiekman his

monthly payments on time, (6) sought to understate the profits of Margate, post-closing, in an effort to seek to deprive Shiekman of his profit sharing entitlement, (7) refused to sign a lease for the offices occupied by Imperial, but not owned by Shiekman or Margate, and (8) moved hundreds of cases of wine valued far in excess of the debt to Parke Bank from the Margate warehouse in New Jersey, where Margate had stored its wine for years, to another warehouse in Brooklyn, New York, owned by Sherry-Lehmann, Gilmer's entity, in violation of the credit agreement with Parke Bank and in violation of the New York State law, all to the significant detriment of Shiekman.

9.      Shiekman discovered just recently, following months of deceit, that Gilmer was not the "honest broker" that he claimed to be but rather he and, on information and belief, along with other owners of Sherry-Lehman, are the Aaserods' partners in Imperial indirectly through a trust for the benefit of Gilmer's children and through other artifices, including an LLC known as "KSC Advisors, LLC."

10.     Neither Bjorn Aaserod nor Cynthia Aaserod had any experience in the wine importing and wholesaling business operated by Margate prior to closing.  In fact, one of Imperials senior managers has asked Shiekman to tell him which of the wines of Imperial are red.  Gilmer, although prevented from doing so by New York State law, has made many, if not all, of the material business decisions for Imperial

post-closing including wine pricing, wine purchasing, and wine warehousing and has traveled to France to meet with Margate's suppliers for those purposes and others. Gilmer continues to act for Imperial and is materially involved in virtually all aspects of Imperial's business.

11.     The financial, operational and other ties between Imperial and Sherry-Lehmann also include Kristofer Green, a principal of Sherry-Lehman and a woman, believed, on information and belief, to be his relative, Samantha Green, who is a principal of Imperial. Further, Imperial has moved much of its wine to a private warehouse owned by Sherry-Lehmann.

12.     Further seeking to hide Gilmer's true role, when Shiekman asked Bjorn Aaserod early in the relationship why Gilmer's brother, Jesse Gilmer, was on Imperial's board, Bjorn Aaserod lied and told him it was because Sherry Lehman was a good customer and he wanted to keep his customer happy. Neither Gilmer nor Bjorn Aaserod ever disclosed that Gilmer and, on information and belief, other owners of Sherry Lehman, owned an interest in Imperial and would personally benefit if Shiekman could reach a deal to sell his business to Imperial.

13.     Imperial's and the Aaserods' multiple breaches of the parties' Agreement and the fraud by all Defendants have caused millions of dollars of damages to Shiekman, damaged his more than forty-year reputation in the wine

business, caused him to lose credibility and business relationships with his suppliers and customers, and caused Shiekman emotional anguish and distress.

14.   It has now become plain that Imperial, is simply a puppet for Bjorn Aaserod and Gilmer, despite the fact that Bjorn Aaserod put the business in his wife Cynthia's name and Gilmer sought to disguise his ownership interest through some type of trust vehicle, and that Bjorn Aaserod has planned to drain the assets of Margate just as he has other business ventures and sought to acquire the Margate business for virtually nothing.  Gilmer, on information and belief, in an effort to assure Sherry-Lehmann a source of fine wine previously sold by Margate, to curry favor with his friend, Bjorn Aaserod, and to avoid New York's laws prohibiting alcoholic beverage retailers owning an interest in wholesalers, to profit from the wine business, and for other unknown reasons, prior to closing made fraudulent representations to induce Shiekman to sell his business, and since closing, has constantly made misrepresentations to Shiekman to inject fear and intimidation to persuade him to negotiate away his contractual rights, interfered with the Agreement, urged Aaserod to breach the Agreement or to terminate it and to have Shiekman exit the wine business after more than forty years.

15.   Gilmer's misrepresentations were made before Shiekman learned that Gilmer and, on information and belief, his other partners in Sherry Lehman, in fact

owned, through one or more artifices, a portion of Imperial and would benefit financially from the Agreement.

16.    The Aaserods', Gilmer's and Imperial's fraudulent representations, misrepresentations and omissions, both alone, jointly, and in conspiracy with others unknown to Shiekman, caused Shiekman to enter into the Agreement, all with the intention of not permitting Shiekman to receive the anticipated benefits and instead to suffer significant damages.

17.    In addition, and in the alternative, Shiekman seeks rescission of the Agreement and damages to restore him to his pre-closing position.

18.    Further in the alternative, Shiekman seeks damages against all Defendants for fraud and fraudulent inducement, based both on affirmative misrepresentations and on misleading omissions.

## PARTIES

19.    Jonathan Shiekman is a citizen of New Jersey.  Bjorn Aaserod is an alien residing in New York and a citizen of Norway.  Cynthia Aaserod, Bjorn's Aaserod's current wife, is a citizen of New York.  Shyda Gilmer is a citizen of New York.  Imperial is New York limited liability company with its principal place of business in New York City, NY.

## BACKGROUND

20.     Shiekman formed Margate in 2005 to continue his family's nearly sixty-year history in the wine importing and distributing business.  Shiekman not only had long-established relationships with foreign growers, but with many customers, including wine wholesalers and retailers with whom he and his family had done business for decades.  The wine business is highly competitive and sales are based both on product quality and deep personal relationships.

21.     Shiekman was looking for a business partner that was capable of providing the needed capital to sustain and grow the business.  After meeting various potential buyers, Shiekman confided in Gilmer what his plans were and Gilmer introduced Shiekman to Bjorn Aaserod.

22.     With that knowledge, Gilmer advised Shiekman that the Aaserods had a net worth of over US $ 200,000,000, had rights to several important wine brands, needed the wine licenses then held by Margate, and wanted to enter the wine business, but then owned a small importer they controlled, Imperial Wine & Spirits LLC.  Imperial and the Aaserods needed Margate and Shiekman to provide support and expertise, and Margate's licenses to help the Aaserods and Imperial exploit what it claimed to be its current and would be brands, as well as to expand Margate's then-current business.  Gilmer and Bjorn Aaserod falsely told Shiekman on several occasions prior to closing that Imperial owned or would shortly acquire

the rights to several prestigious wine labels and needed help to realize their full commercial potential. Gilmer told Shiekman that Bjorn Aaserod could and would satisfy Margate's capital needs. Gilmer never told Shiekman that he secretly owned a portion of Imperial or that Gilmer and, on information and belief, the other owners of Sherry-Lehmann, would benefit personally from gaining control of Margate with the Aaserods.

23.    Gilmer and the Aaserods were close friends. Gilmer knew that if the Aaserods purchased Margate, Gilmer would benefit personally through Gilmer's ownership of Imperial, and Gilmer's business, Sherry Lehmann, Inc., a prominent New York City wine and liquor retailer, would be assured a consistent source of hard to purchase fine French and Italian wines, many from the Burgundy region of France and Italy that Margate was supplying to Sherry-Lehmann, on favorable terms. Gilmer thus had a strong financial incentive to persuade Shiekman to sell his interest in Margate to the Aaserods.

24.    The Aaserods met with Shiekman on several occasions prior to closing and reiterated their desire to enter the wine business and wanted to make Shiekman their partner, including promising him that it would be business as usual after closing and that Shiekman would receive fifty (50) percent of the profits of Margate after closing, in addition to the ten years of guaranteed payments for the value of Margate's business and other significant financial benefits. Of

significance, the Aaserods and Imperial also agreed to pay off Margate's line of credit with Parke Bank, a debt clearly disclosed in the Agreement, for which both Shiekman and his wife were guarantors.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1), in that the plaintiff and all defendants are citizens of different states, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

26.    This Court has personal jurisdiction over all defendants because all defendants are citizens of New York State and reside with this District.

27.    Venue is based on 28 U.S.C. § 1391 (b)(1), in that Imperial's principal place of business is located in this District and the Aaserods and Gilmer reside in this District.  In addition, under Section 8.11 of the Agreement, all parties consent to jurisdiction and venue in this District.

## THE MEMBERSHIP PURCHASE AGREEMENT

28.    Shiekman and Imperial (through Cynthia Aaserod, at the instruction of and as a puppet for Bjorn Aaserod) simultaneously executed the Agreement on October 1, 2014, and closed the transaction on that date.  The Agreement is attached hereto as Exhibit A.

29.   Under the Agreement, the consideration for Imperial's purchase of Margate was to include, as here relevant, an installment payment of US $ 22,000 per month for 120 months, fifty percent of the profits of Margate for the last calendar quarter of 2104, a $52,000 annual draw as a credit against Shiekman's post-closing salary and as a share of the future profits of Margate, payment of various other expenses of Shiekman including his family's health insurance, and repayment of the Parke Bank line of credit that exceeded US $ 532,000 at closing.

30.   The installment payments were to be made by Imperial, which represented that it had and would in the future have sufficient funds to perform its obligations under the Agreement, thereby not artificially reducing Margate's profits and Shiekman's profit sharing.

## BREACHES OF THE AGREEMENT

31.   Despite the clear and specific requirements of the Agreement, immediately after closing Imperial and the Aaserods began taking steps to pay the installment payments late and from the assets of Margate rather than from Imperial.   In addition, despite promises to the contrary on numerous occasions, Imperial and the Aaserods have refused to eliminate or repay the Parke Bank line of credit, although Shiekman paid $232,000 and Margate made two $30,000 payments from its assets.   In addition, on information and belief, Aaserod

misrepresented to Parke Bank that he was unaware of the line of credit, despite clear mention of the debt in the Agreement and its attendant schedules.

32.    In addition, in violation of the loan agreements with Parke Bank and contrary to the Agreement, Aaserod caused hundreds of cases of fine wine located in Hanover, N.J., in which Parke Bank had a security interest, to be moved to a private warehouse in Brooklyn, NY, owned or controlled by Sherry-Lehmann, which actions potentially depleted the assets of Margate, exposed Shiekman to greater liability under his guaranty and further evidenced the unified operation of Sherry-Lehmann and Imperial.

33.    Rather than making Shiekman a partner as anticipated and permitting him to maximize his profit sharing, post-closing, the Aaserods and Imperial have constantly imposed unreasonable conditions on Shiekman's sales efforts and inventory replenishment efforts, and have sought to impair all attempts to maintain the critical supplier relationships, thereby threatening Shiekman's anticipated profit sharing.

34.    Post-closing, still posing as Shiekman's friend, Gilmer, disguising his role as a principal of Imperial, repeatedly told Shiekman that Bjorn Aaserod was unhappy with Shiekman's performance and sought to pretend that he was an "honest broker" seeking a resolution of the brewing business dispute between Shiekman and Bjorn Aaserod.  Gilmer never advised Shiekman that Gilmer would

benefit financially if Shiekman were to agree to reduce the purchase price or to amend the other terms of the Agreement, as Gilmer urged.

35.    Gilmer, still posing as the "honest broker," claimed to be trying forge a deal between Bjorn Aaserod and Shiekman because Bjorn was allegedly upset with several unenunciated breaches of the Agreement by Shiekman.   Further, Gilmer pushed Shiekman to capitulate and accept what Bjorn Aaserod would give him with messages texted at all hours of the day and night like:  "Do you want to deal with this or let the cards fall!"; "Are we speaking? Need to advise Mr. Aaserod!"; "You call him! You created these issues now stand up and take responsibility for them. I'm done!"; and "My friend you are in dangerous territory!"

36.    Gilmer knew that he was no friend of Shiekman's and was threatening Shiekman with lawsuits by the Aaserods that would then be filed at 8:00 a.m. the next morning if Shiekman did not take Bjorn Aaserod's deal with pre-textual claims of hidden breaches by actions that never occurred.

37.    Gilmer knew that there was no deal from Bjorn Aaserod even to consider because Aaserod, through his lawyer, insisted that Shiekman make an offer the settle.  Despite efforts to find a compromise, Bjorn Aaserod insisted, while Gilmer volleyed threats, that Shiekman lower his offer to the point where Bjorn Aaserod, through his counsel, stated that Shiekman needs to be "ready to

make real sacrifices and be conciliatory and Bjorn would let Jonny retain his dignity and pay his bills."

38.     Gilmer knew that, while Aaserod and Shiekman may not have been personally compatible, Shiekman had not varied in the way he conducted the business and that the unenunciated claimed breaches were just a pretext for Gilmer and Aaserod's grand plan to steal the business.

39.     Even responding to Gilmer and Aaserod's unprofessional and heavy-handed tactics, Shiekman acted by calling Bjorn Aaserod as instructed and received no response.

40.     Cynthia Aaserod, in a response to Shiekman's request that he be removed as the guarantor of the company's American Express Card that was funding the business and increasing markedly, told Shiekman that he was in breach of obligations, including the fact that he was impermissibly competing with Margate, which she knew or should have known was totally false.

41.     Imperial and the Aaserods have refused to sign a lease for the office now occupied by Imperial in Northfield, NJ, in violation of the Agreement.

42.     Imperial and the Aaserods have improperly and illegally, in breach of the Agreement, undervalued the closing inventory of Margate Wine& Spirit, LLC, and illegally caused Shiekman to have to utilize his own funds on Imperial's behalf.

16

43.   Imperial and the Aaserods have refused to repay the Parke Bank line of credit.

44.   Since closing Gilmer and Aaserod have operated the former Margate business to reduce, if not eliminate, Shiekman's right to a share of Margate's profits post-closing.

## COUNT ONE

### (BREACH OF CONTRACT AGAINST IMPERIAL, BJORN AASEROD AND CYNTHIA AASEROD)

45.   Shiekman adopts, realleges, and incorporates by reference, as if fully set forth, all allegations contained in the preceding paragraphs 1-424.

46.   The Agreement is a valid and enforceable contract.

47.   Shiekman has performed and continues to perform all of his obligations under the Agreement.

48.   Bjorn Aaserod is the alter ego of Imperial and has operated Imperial and, along with Gilmer or as directed by Gilmer, made all the significant business decisions regarding Imperial both prior to and after closing.  Prior to closing, Bjorn Aaserod met with Shiekman to discuss the terms of the Agreement, negotiated over the Agreement's final terms, met with Parke Bank to discuss the repayment or refinancing of the line of credit, and participated in other discussions regarding the purchase of Shiekman's interest in Margate.  Since closing, Bjorn Aaserod has traveled to France, upon information and belief, accompanied by Gilmer, to meet

with suppliers, has constantly emailed Shiekman, using an Imperial email address, regarding all aspects of the business and has acted as an executive of Imperial at all times.

49.     The Aaserods and Imperial have not performed their obligations under the Agreement.

50.     The Aaserods and Imperial have materially breached, *inter alia*, Sections 2.2, 2.3, 2.7, 4.3, 5.5 and 5.6 of the Agreement.

51.     The Aaserods and Imperial have also breached theirs duty of good faith and fair dealing by, in addition to its specific breaches of the Agreement, repeatedly acting to deny Shiekman the benefit of his bargain.

52.     Defendants, by their breaches, have proximately caused Shiekman to suffer substantial damages in an amount in excess of $75,000.

## COUNT TWO
## (DECLARATORY JUDGMENT)

53.     Shiekman adopts, realleges, and incorporates by reference, as if fully set forth, all allegations contained in the preceding paragraphs 1-52.

54.     The Agreement is a valid and enforceable contract.

55.     Shiekman has performed and continues to perform all of its obligations under the Agreement.

56.    The Imperial and the Aaserods are liable for all payments due Shiekman under the Agreement.

57.    A legally cognizable controversy exists between Shiekman and the Aaserods and Imperial regarding the calculation of Shiekman's profit sharing under the Agreement and the other items in dispute..

58.    Shiekman, seeks a declaration that the Aaserods and Imperial are obligated to perform the Agreement in accordance with its terms.

## COUNT THREE

### (FRAUD, INCLUDING FRAUDULENT INDUCEMENT, AND INTENTIONAL MISREPRESENTATIONS AGAINST ALL DEFENDANTS)

59.    Shiekman adopts, realleges, and incorporates by reference, as if fully set forth, all allegations contained in the preceding paragraphs 1-588.

60.    Shiekman alleges this claim in the alternative.

61.    Gilmer fraudulently or knowingly and intentionally misrepresented his ownership interest in Imperial in urging Shiekman to enter into the Agreement and the Aaserods fraudulently or knowingly and intentionally misrepresented their intention to perform the Agreement, post-closing.   Gilmer and the Aaserods fraudulently told or knowingly and intentionally misrepresented Shiekman prior to closing the Aaserods owned the rights to several prominent wine labels, that the Aaserods has access to significant capital to expand the business of Margate,

thereby providing significant profit sharing opportunities to Shiekman. Gilmer never advised Shiekman that Gilmer would benefit personally if the deal closed

62.    Defendants fraudulently or knowingly and intentionally hid from Shiekman the true ownership of Imperial, Imperial's intention not to perform any material term of the Agreement and to seek to marginalize Shiekman and his forty-year experience as a wholesaler of fine wines.

63.    Defendant's intentional misstatements and omissions were made with the necessary scienter and intent to deceive, including by Gilmer and the Aaserods, who were acting for Imperial prior to and since closing.

64.    Shiekman reasonably relied upon Defendants misrepresentations and omissions in entering into the Agreement and the transaction it reflected, and in performing under the Agreement. Defendants designed their statements and behavior to secure Shiekman's reliance. Defendants intended and expected that Shiekman would so rely.

65.    Prior to closing, Gilmer used his position at Sherry-Lehmann to threaten Shiekman that if Shiekman did not consummate the deal with Imperial, Margate's business with Sherry-Lehmann would decline. At no time until March 12, 2015, did Shiekman learn of Gilmer's duplicity and undisclosed ownership of Imperial. Only on March 12, 2015, did Shiekman inadvertently learn of Gilmer's undisclosed interest in Imperial, purportedly held through a trust established for

benefit of Gilmer's minor child, the trustee of which is Gilmer's brother. This transparent effort to avoid the New York "tied house" laws directly harmed Shiekman as Imperial directed its post-closing actions to benefit Gilmer, through his ownership of Sherry-Lehmann and Imperial.  In addition, Gilmer has repeatedly and regularly made significant day to day decisions regarding the business  of Imperial to the detriment of Shiekman.  Indeed, Imperial, has caused much of Margate's wine inventory previously stored in New Jersey to be moved to a warehouse in Brooklyn controlled by Sherry-Lehmann, further evidencing the overlapping ownership between Sherry-Lehmann and Imperial and the close coordination of their business interests.

66.    As the Aaserods and Imperial have breached many significant promises made in the Agreement, it is apparent that the Aaserods and Imperial did not intend to perform their side of the bargain.

67.    Defendants' material and fraudulent misrepresentations and omissions caused Shiekman to enter into the transaction and to forgo his right to continue to operate Margate as a viable, stand-alone business.

68.    Defendants' fraud or intentional misrepresentations caused Shiekman to suffer millions of dollars in damages.

## COUNT FOUR

### (INTERFERENCE WITH CONTRACT-AGAINST GILMER AND BJORN AASEROD)

69.     Shiekman adopts, realleges, and incorporates by reference, as if fully set forth, all allegations contained in the preceding paragraphs 1-68.

70.     In the alternative, to the extent Gilmer does not hold a beneficial interest in Imperial or Aaserod is found not to be the alter ego of Imperial, both Gilmer and Aaserod have unlawfully interfered with the contract between Shiekman and Imperial.

71.     By urging Imperial not to perform its obligations under the Agreement and by constantly urging Shiekman to renegotiate the Agreement, both Gilmer and Aaserod have sought to prevent Imperial from performing under the Agreement and to prevent Shiekman from receiving the benefits to which Shiekman is otherwise entitled.  Here, there is a valid contract between Shiekman and Imperial of which Gilmer and Bjorn Aaserod clearly had knowledge.  Both Gilmer and Aaserod caused Imperial to breach its Agreement without any justification or reason, *inter alia*, by not paying off the Parke Bank line of credit, illegally writing down the value of Margate inventory, and not signing a lease for the premises at 2800 Shore Road in Northfield, NJ, and refusing to pay Shiekman his profit sharing, all in clear breach of the Agreement and without any justification.

72.     By not receiving the benefits due him under the Agreement as a direct result of Gilmer's and Aaserod's interference, Shiekman has suffered substantial damages.

## COUNT FIVE

### (CLAIM FOR WAGES NOT PAID IN VIOLATION OF N.J.S.A. 34:11-4.1 *et seq*. WAGE PAYMENT LAW AGAINST ALL DEFENDANTS EXCEPT GILMER)

73.     Shiekman adopts, realleges, and incorporates by reference, as if fully set forth, all allegations contained in the preceding paragraphs 1-72.

74.     Under the Agreement, Shiekman is entitled to receive a monthly draw and expenses.

75.     Imperial has not paid the draw and expenses when due.

76.     This failure to pay wages due is in violation of the N.J.S.A. 34:11-4.1 et seq. Wage Payment Law.

### PRAYER FOR RELIEF

WHEREFORE, Jonathan Shiekman prays that this Court enter judgment against Defendants Bjorn Aaserod, Cynthia Aaserod, Shyda Gilmer and Imperial Wine & Spirits, LLC, as follows:

A.     For an award of damages for breach of contract in the amount in excess of $75,000, together with interest thereon, and all costs and fees associated with this litigation;

B.     For a declaration that Imperial and the Aaserods have breached the Agreement, together with Shiekman's costs and fees;

C.     In the alternative, for a finding of fraudulent inducement and fraud in the execution of the Agreement, or for intentional misrepresentations, for rescission and of the Agreement, and for all damages flowing therefrom and the rescission, including punitive damages, together with Shiekman's costs and fees;

D.     In the alternative, for a finding that Gilmer and Bjorn Aaserod unlawfully interfered with the Agreement, and for all damages flowing from that interference, including punitive damages, together with Shiekman's costs and fees;

E.   A judgment for unpaid wages due Shiekman; including counsel fees and costs, and

F.   For such other or further relief as the Court deems just, proper and equitable.

Dated:  April 17, 2015.

James D. Rosener (NY Bar # 4260857)
PEPPER HAMILTON LLP
620 Eighth Avenue, 37th Floor
New York, NY 10018
212.808.2717
rosenerj@pepperlaw.com

and

Laurence Z. Shiekman *(pro hac vice to be filed)*
PEPPER HAMILTON LLP
Two Logan Square
Suite 3000
Philadelphia, PA 19103
215.981.4347202-220-1220
shiekmanl@pepperlaw.com

*Attorneys for Plaintiff Jonathan Shiekman*