# Exhibit A

*Execution Version*

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into on October 1, 2014, between Imperial Wine & Spirits LLC, a New York limited liability company ("Purchaser") and Jonathan Shiekman, a natural person of 2800 Shore Road, Northfield, New Jersey 08225 ("Seller"), relating to the purchase and sale of all of the outstanding limited liability company interests of Margate Wine and Spirit Company, LLC, a New Jersey limited liability company (the "Company").

### BACKGROUND

WHEREAS, Seller is the record and beneficial owner of all of the issued and outstanding limited liability company interests of the Company (the "Interests");

WHEREAS, the Interests represent all of the issued and outstanding equity of the Company;

WHEREAS, the Company is engaged in the business of the import, export, sale, marketing and distribution of wines in the United States (the "Business"); and

WHEREAS, Seller wishes to sell and dispose of, and Purchaser wishes to purchase and assume, the Interests on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1. Definitions.

(a) As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified, and, with respect to any natural person, shall be deemed to include such person's former or current immediate family members. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Assets" means all of the assets, properties and rights of the Company or the Seller and his Affiliates, that are as at the date of this Agreement, used or held for use in or otherwise related to or necessary for the conduct of, the Business.

"Balance Sheet" means the most recent balance sheet included in the Financial Statements dated as of December 31, 2013.

"Business Day" means any day other than a Saturday, Sunday or any day on which banks located in the State of New York are authorized or required to be closed for the conduct of regular banking business.

"<u>Business Material Adverse Effect</u>" means any material adverse effect on (i) the business, assets, condition (financial or otherwise) or results of operations of the Company taken as a whole, or (ii) the ability of the Seller to perform its obligations under this Agreement in a timely manner or to consummate the transactions contemplated by this Agreement without material delay except to the extent caused by events, circumstances or other conditions affecting or impacting generally businesses in the industry in which the Company operates.

"<u>Business Permits</u>" has the meaning given to that term in Section 3.13(b).

"<u>Cause</u>" means (A) Seller's commission of, or plea of guilty or *nolo contendere* to a (x) felony, (y) crime involving moral turpitude, or (z) any other offense or circumstance which, in each of the foregoing cases identified in clauses (x), (y) and (z) above, would preclude Seller from working in the alcoholic beverages industry in substantially the same capacity as before any such event, (B) Seller's willful and material (x) misconduct in contravention of Section 5.4(a) hereof, that is not cured following thirty (30) days written notice from Purchaser to Seller or (y) disparagement of Purchaser or Affiliates thereof, or (C) Seller's material breach of Section 5.3 of this Agreement.

"<u>Closing</u>" means the closing of the sale and purchase of the Interests as contemplated by this Agreement.

"<u>Closing Net Working Capital</u>" has the meaning given to that term in Section 2.7(a).

"<u>Closing Net Working Capital Statement</u>" has the meaning given to that term in Section 2.7(a).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Company Contract</u>" means any contract, agreement, arrangement or understanding (written or oral) to which the Company is party or by which it or its assets are bound as of the date hereof.

"<u>Company Plan</u>" means a Plan that the Company, or any ERISA Affiliate, sponsors, maintains, has any obligation to contribute to, has or may have liability under or is otherwise a party to, or that otherwise provides benefits for employees, former employees, independent contractors or former independent contractors (or their dependents and beneficiaries) of the Company, on the date of this Agreement or at any time subsequent thereto and, in the case of a Plan that is subject to Part 3 of Title I of ERISA, Section 412 of the Code or Title IV of ERISA, at any time during the five-year period preceding the date of this Agreement.

"<u>Dispute Notice</u>" has the meaning given to that term in Section 2.7(b).

"<u>Draw</u>" has the meaning given to that term in Section 5.4(a).

"<u>Encumbrances</u>" means any and all liens, charges, security interests, mortgages, pledges, options, preemptive rights, rights of first refusal or first offer, proxies, levies, voting trusts or agreements, or other adverse claims or restrictions on title or transfer of any nature whatsoever.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"<u>ERISA Affiliate</u>" means any Person required at any particular time to be aggregated with the Company under Sections 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Liabilities" means all liabilities of the Company, Seller and their respective Affiliates, whether accrued, unaccrued, contingent or otherwise, (a) which relate to or arise in respect of the period prior to Closing (excluding the debt as specified in Exhibit 1.1(a) (up to the amount specified on Exhibit 1.1(a), the "Line of Credit") and the current liabilities in the Closing Net Working Capital as at Closing as determined in accordance with Section 2.7); (b) to the extent not related to the Business; or (c) arising after Closing under or with respect to any Company Contract which is not listed or described on Schedule 3.17.

"Financial Statements" has the meaning given to that term in Section 3.6.

"Fine Wine Division" means the division of the Business (whether operated as a standalone entity or as part of the business of Purchaser) historically operated as the fine wine division of the Company during the 12 months prior to the date hereof and the products handled thereby, including any products which are not part of the "Premium Wine Division" under the definition thereof, hereunder.

"GAAP" means United States generally accepted accounting principles.

"Good Reason" means (A) a material adverse change in the scope or nature of Seller's obligations, excluding any such change in connection with Seller's death or disability or (B) a relocation of Seller's workplace (excluding, for the avoidance of doubt, required travel) more than 20 miles from the current location; provided that the events described in clauses (A) and (B) shall constitute Good Reason only if Purchaser fails to cure such event within 30 days after receipt from Seller of written notice of the event which constitutes Good Reason.

"Governmental Authority" means any international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Indemnification Cap" has the meaning given to that term in Section 7.4.

"Indemnified Party" means any Person claiming indemnification under any provision of Article VII.

"Indemnifying Party" means any Person against whom a claim for indemnification is being asserted under any provision of Article VII.

"Installments" has the meaning given to that term in Section 2.2(a).

"Intellectual Property" means all intellectual property used or held for use by the Company.

"Inventory" means all inventory that is now, or at the time of the Closing will be, used or held for use in or otherwise related to, useful in or necessary for the conduct of, the Business, including finished goods, work in process, supplies and raw materials maintained, held or stored for or on behalf of the Company.

"IRS" means the United States Internal Revenue Service.

"Lender" has the meaning given to that term in Section 2.6(e).

"<u>Losses</u>" means any and all damages, fines, fees, penalties, deficiencies, liabilities, claims, losses (including loss of value), demands, judgments, settlements, actions, obligations and reasonably incurred costs and expenses (including interest, court costs and reasonably incurred fees and costs of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment); provided that Losses shall not include liabilities to the extent otherwise reflected in the Closing Net Working Capital; provided further that Losses shall not include (i) special, (ii) punitive, (iii) "multiple of profits" or "multiple of cash flow" or (iv) remote damages or other such damages which would not be reasonably foreseeable by the parties with respect to the breach or underlying matter.

"<u>Lump Sum Date</u>" has the meaning given to that term in Section 2.2(b).

"<u>Lump Sum Notice</u>" has the meaning given to that term in Section 2.2(b).

"<u>Lump Sum Payment</u>" has the meaning given to that term in Section 2.2(b).

"<u>Merchantable</u>" means with respect to wine products held by the Company, each such product which (i) meets the analytic specifications for wine sold in the ordinary course of business as bulk or bottled under the intended brand; (ii) does not evidence off-tastes, smells or appearances, or contamination or chemical deficiencies, rendering it unsalable as wine in the ordinary course of business either as bulk or bottled under the intended brand; and (iii) complies with all applicable federal and state laws.

"<u>Payment Term</u>" has the meaning given to that term in Section 2.2(a).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation established under ERISA.

"<u>Permit</u>" means any permit, license, franchise, approval, consent, registration, clearance, variance, exemption, order, certificate or authorization by or of any Governmental Authority.

"<u>Person</u>" means any natural person, corporation, general partnership, limited partnership, limited or unlimited liability company, proprietorship, joint venture, other business organization, trust, union, association or Governmental Authority.

"<u>Plan</u>" means any employment, consulting, bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, stock ownership, stock appreciation rights, phantom stock, equity (or equity-based), leave of absence, layoff, vacation, day or dependent care, legal services, cafeteria, life, health, medical, dental, vision, welfare, accident, disability, workmen's compensation or other insurance, severance, separation, termination, change of control, collective bargaining or other benefit plan, understanding, agreement, practice, policy or arrangement of any kind, whether written or oral, and whether or not subject to ERISA, including any "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"<u>Pre-Closing Tax Period</u>" means any Tax period ending on or before the date of this Agreement.

"<u>Premium Wine Division</u>" means the division of the Business (whether operated as a standalone entity or as part of the business of Purchaser) historically operated as the premium wine division of the Company during the 12 months prior to the date hereof, *less* any products that no longer meet the requirements to be included in such division consistent with historical standards, *plus* any products added to the division consistent with historical standards, all as agreed in good faith by

Purchaser and Seller from time to time following the date hereof, and in any case excluding any products historically handled by the Fine Wine Division.

"Premium Wine Net Profits" means the net profits after the deduction of direct costs and expenses, selling, general and administrative expenses, amortization, interest and taxes of the Premium Wine Division determined in accordance with GAAP; provided that Purchaser shall only allocate expenses and charges to the Premium Wine Division to the extent fairly and proportionately related to such business operations.

"Profits Participation Period" has the meaning given to that term in Section 2.3.

"Purchase Price" has the meaning given to that term in Section 2.2(a).

"Purchaser Indemnified Parties" has the meaning given to that term in Section 7.2.

"Reviewing Accountant" has the meaning given to that term in Section 2.7(c).

"Seller Disclosure Schedule" has the meaning given to that term in Article III.

"Seller Indemnified Parties" has the meaning given to that term in Section 7.3.

"Seller's Knowledge" means the actual or constructive knowledge of Seller, after due inquiry.

"Statement of Target Net Working Capital" means the total current assets *minus* the total current liabilities as set forth and calculated on Exhibit 1.1(b) hereto.

"Straddle Period" means any Tax period beginning, but not ending, on or before the date of this Agreement.

"Subsidiary" means, with respect to any Person, any other Person (i) of which the first Person owns directly or indirectly 50% or more of the equity interest in the other Person; (ii) of which the first Person or any other Subsidiary of the first Person is a general partner or (iii) of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the first Person and/or one or more of the first Person's Subsidiaries.

"Tax" means (i) any U.S. federal, state or local, or any non-U.S., income, franchise, profits, gross receipts, license, ad valorem, net worth, value added, sales, use, real or personal property, payroll, withholding, employment, social security (or similar), excise, environmental, customs duties, stamp, registration, alternative and add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever payable to any Tax Authority and including all interest, penalties, additional taxes and additions to tax imposed with respect thereto and (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract, or otherwise.

"Tax Authority" means any Governmental Authority responsible for the imposition, assessment or collection of any Tax.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

Section 1.2. Other Defined Terms.

(a) For the purposes of this Agreement, except to the extent that the context otherwise requires:

(i)    whenever the words "include," "includes" or "including" (or similar terms) are used in this Agreement, they are deemed to be followed by the words "without limitation" and the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement and references to "$" means United States Dollars;

(ii)    if any action is to be taken by any party hereto pursuant to this Agreement on a day that is not a Business Day, such action shall be taken on the next Business Day following such day; and

(iii)    references to a Person are also to its permitted successors and assigns.

## ARTICLE II

## PURCHASE AND SALE OF INTERESTS

Section 2.1. Purchase and Sale.  At the Closing, upon the terms of this Agreement, Seller will sell, transfer, assign, convey and deliver to Purchaser, and Purchaser will purchase from Seller, and acquire good and valid title to, free and clear of all Encumbrances, the Interests in exchange for the Purchase Price.

Section 2.2. Purchase Price.

(a) The purchase price (the "Purchase Price") for the Interests shall be equal to (i) US$2,275,000 plus interest of 3% per annum, *plus* (ii) the Lump Sum Payment, each subject to Sections 2.2(b), 2.2(c) and 2.7 hereof, as the case may be, with the payments pursuant to the foregoing clause (i) payable by Purchaser to Seller in equal monthly installments (the "Installments") of US$22,000 on the first business day of each month commencing on the date of this Agreement, with the last payment of the Installments being made on the 120th month anniversary from the date of this Agreement (the "Payment Term").  The parties intend for the Purchase Price to be treated as an installment sale with the Installment including and being treated as inclusive of interest of 3% *per annum* as set forth on the amortization schedule set forth on Section 2.2(a) of the Seller Disclosure Schedule.

(b) At any time after the 60th month anniversary of the date of this Agreement (the "Lump Sum Date") and before the end of the Payment Term, Seller may elect to receive, by giving written notice to Purchaser (the "Lump Sum Notice"), a buy-out payment of US$1,000,000 (the "Lump Sum Payment").  Purchaser shall pay the Lump Sum Payment to Seller within 30 days from the date of receipt of the Lump Sum Notice by Purchaser.  Upon payment of the Lump Sum Payment in accordance with this Section 2.2(b), Seller acknowledges and agrees that Purchaser shall be fully and finally discharged of any further obligation to pay any amounts due under this Article II.

AMR-492753-v10                                        - 6 -                                        NEW

(c) If for any reason Seller's participation in the Business as contemplated by Section 5.4(a) terminates or ceases and such date is prior to the Lump Sum Date, Purchaser shall be obligated to continue to pay the Installments on a monthly basis through the end of the Payment Term as contemplated by Section 2.2(a), *plus*, unless (A) "Cause" then exists or (B) Seller has terminated or ceased participation in the Business as contemplated by Section 5.4(a) for other than "Good Reason" (in which case the Lump Sum Payment as would otherwise be thereafter due shall not be payable), the Lump Sum Payment at the end of the Payment Term (unless Seller provides a Lump Sum Notice, in which event Section 2.2(b) shall prevail). Upon payment of the amounts in accordance with this Section 2.2(c), Seller acknowledges and agrees that Purchaser shall be fully and finally discharged of any further obligation to pay any amounts due under this Article II.

(d) If for any reason Seller's participation in the Business as contemplated by Section 5.4(a) terminates or ceases and such date is after the Lump Sum Date, Purchaser shall be obligated to continue to pay the Installments on a monthly basis through the end of the Payment Term as contemplated by Section 2.2(a), *plus* the Lump Sum Payment at the end of the Payment Term (unless Seller provides a Lump Sum Notice, in which event Section 2.2(b) shall prevail). Upon payment of the amounts in accordance with this Section 2.2(d), Seller acknowledges and agrees that Purchaser shall be fully and finally discharged of any further obligation to pay any amounts due under this Article II.

(e) If Seller has the right to be paid the Lump Sum Payment under the terms hereof as of the last Business Day of the Payment Term, and Seller has not delivered the Lump Sum Notice as at such date, the Lump Sum Notice will be deemed to have been delivered without action of the Seller as at such date, it being the intention of the parties, for the avoidance of doubt, that the Seller get the Lump Sum Payment by the end of the Payment Term (unless Seller's participation in the Business as contemplated by Section 5.4(a) terminates or ceases before the Lump Sum Date and "Cause" then exists or Seller does not terminate for "Good Reason", each as contemplated by Section 2.2(c)). Any payments required to be made by Purchaser under this Agreement (unless otherwise specified) shall be made by Purchaser by wire transfer of immediately available funds to such account as set forth in Exhibit 2.2(e) subject to amendment by Seller by giving at least 2 Business Days' written notice to Purchaser prior to the date such payment is due.

Section 2.3. <u>Profits Participation; No Obligation to Support Division.</u> Seller and Purchaser shall each be entitled to 50% of the net profits after the deduction of direct costs and expenses, selling, general and administrative expenses, amortization, interest and taxes of the Business (whether operated on a standalone basis or as part of the Purchaser following Closing, to be determined and paid no later than March 1, 2015, in accordance with GAAP for the year ending December 31, 2014. During the Payment Term and for up to 50 months following the end of the Payment Term to the extent Seller continues to participate in the Business as contemplated by Section 5.4(a) (such entire period, the "<u>Profits Participation Period</u>"), on March 1 following the end of each fiscal year ending within the Profits Participation Period (excluding the year ending December 31, 2014, which is covered by the immediately preceding sentence), Seller will be entitled to a sum equal to (A) 50% of the Premium Wine Net Profits whether operating as a standalone subsidiary or as a division of Purchaser, during each fiscal year, *minus* (except in the case of the fiscal year ending December 31, 2014 only), (B) the Draw, *plus* (C) any bonus in respect of the performance of the Business (whether operated on a standalone basis or as part of the Purchaser) excluding the Premium Wine Division, as a result of Seller's efforts with respect thereto, as Purchaser determines to pay Seller in the sole discretion of Purchaser. Seller and Purchaser agree to treat, and to cause their Affiliates to treat, the profit-sharing arrangement described in this Section 2.3 for federal, state and local Tax purposes as a partnership. Seller and Purchaser shall, and shall cause their Affiliates to, file their Tax Returns and otherwise take positions before Tax Authorities consistent with such treatment and, without limiting the foregoing, shall cause the partnership referenced in the preceding sentence to file

appropriate partnership Tax Returns (including Internal Revenue Service Form 1065) with the applicable Tax Authorities.

Section 2.4. Closing.  The Closing shall be held at the offices of Clifford Chance US LLP, 31 West 52nd Street, New York, New York 10019, at 10:00 a.m. local time, on the date of this Agreement or at such other time or place as Purchaser and Seller mutually agree.

Section 2.5. Closing Deliveries by Purchaser.

At the Closing, Purchaser will deliver or cause to be delivered to Seller $22,000 by wire transfer of immediately available funds to such account as Seller may direct by written notice to Purchaser.

Section 2.6. Closing Deliveries by Seller.  At the Closing, Seller will deliver to Purchaser:

(a) an instrument of transfer of the Interests duly executed in blank, sufficient to vest good and valid title to the Interests in Purchaser;

(b) all of the books and records of Seller to the extent solely relating to the Company;

(c) resignations, to be effective as of the Closing, of all members of the management committee, board of directors and officers of the Company, including Jonathan Shiekman and Morton B. Shiekman;

(d) a duly executed Spousal Consent in the form attached hereto as Exhibit 2.6(d);

(e) A true and correct certificate stating the outstanding amount due under the Line of Credit as of Closing extended by Parke Bank ("Lender"), which Line of Credit to the extent of the description of the obligations described as due and owing as of immediately following consummation of the Closing, on the certificate, will remain an obligation of the Company or shall be satisfied at Closing by Purchaser, in each case without offset or deduction from the Purchase Price;

(f) a certification signed under penalty of perjury satisfying the requirements of Treasury Regulation Section 1.1445-2(b); and

(g) such further instruments and documents as may be required to be delivered by Seller pursuant to the terms of this Agreement or as may be reasonably requested by Purchaser in connection with the Closing of the transactions contemplated hereby.

Section 2.7. Closing Net Working Capital Statement.

(a) As promptly as practicable following the date of this Agreement, but in no event more than 60 days following the date of this Agreement, Purchaser will prepare and deliver to Seller a net working capital statement of the Company as of the date of this Agreement (the "Closing Net Working Capital Statement") that shall be prepared in accordance with the Statement of Target Net Working Capital, and otherwise in accordance with GAAP applied on a basis consistent with the preparation of the Balance Sheet and in any case excluding inventory which is not Merchantable in the good faith determination of Purchaser (provided that Purchaser delivers reasonable written evidence of its basis for its determination.  As used herein, "Closing Net Working Capital" shall equal the total current assets minus the total current liabilities shown on the Closing Net Working Capital Statement finally determined pursuant to (and in accordance with) this Section 2.7.

(b) Unless within 60 days after delivery of the Closing Net Working Capital Statement, Seller shall deliver to Purchaser a notice setting forth, in reasonable detail, any good faith dispute as to the Closing Net Working Capital Statement and the basis for such dispute (a "Dispute Notice"), the Closing Net Working Capital Statement shall be deemed accepted by Seller and shall be final and binding.

(c) For 15 days after Purchaser's receipt of a Dispute Notice, the parties shall endeavor in good faith to resolve by mutual agreement all matters in the Dispute Notice. If the parties are unable to resolve any matter in the Dispute Notice within such 15-day period, Purchaser and Seller shall engage Robins & Associates LLP in Suffern, New York as the "Reviewing Accountant" (if such accounting firm is unable or unwilling to serve as the Reviewing Accountant, the parties shall, within 15 days after the end of such 15-day period, agree on an alternate independent accounting firm or have such selection made pursuant to the rules of the American Arbitration Association to resolve the remaining disputes). Purchaser and Seller will each pay one-half of the fees and expenses of the Reviewing Accountant.

(d) Purchaser and Seller shall instruct the Reviewing Accountant to resolve the disputed matters as promptly as practicable. The parties shall cooperate with each other and the Reviewing Accountant in connection with the matters set forth in this Section 2.7, including by furnishing such information as may be reasonably requested. Each party shall afford the other parties the opportunity to participate in all communications with the Reviewing Accountant. The determination of the Reviewing Accountant shall be final and binding and no party shall seek recourse to courts, other tribunals or otherwise, other than to collect any amounts due under this Section 2.7. Judgment may be entered to enforce the Reviewing Accountant's determination in any court having jurisdiction over the party against which such determination is to be enforced.

(e) Upon the final determination of the Closing Net Working Capital Statement in accordance with Sections 2.7(b), (c) or (d),

(i) if the Closing Net Working Capital is less than $0.00, Seller shall pay Purchaser the amount by which the Closing Net Working Capital is less than $0.00 by way of deduction from payments to be made to Seller pursuant to Section 2.2(a); provided that Purchaser will consider in good faith Seller's request to distribute such deductions over multiple Installments; or

(ii) if the Closing Net Working Capital is more than $0.00, Purchaser shall pay to Seller the amount by which the Closing Net Working Capital is more than $0.00 by wire transfer of immediately available funds.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF SELLER

Seller represents and warrants to Purchaser that, except as set forth in the disclosure schedule delivered by Seller to Purchaser prior to the execution and delivery of this Agreement, which identifies exceptions only by the specific Section or subsection to which each entry relates; provided that if a disclosure is made in one of or in any part of any of such schedules, such disclosure will be deemed to have also been made in each other Seller disclosure schedule hereto where the relevance of such disclosure is readily apparent on the face of any disclosure (the "Seller Disclosure Schedule"):

Section 3.1. Authority; Non-Contravention; Approvals.

(a) Seller is a natural person with full capacity, legal right, power and authority to execute and deliver this Agreement to which he is a party and to perform the transactions contemplated by this Agreement. This Agreement and the other agreements contemplated by this Agreement to be entered into at Closing have been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Purchaser, constitute valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(b) The execution and delivery by Seller of this Agreement and the other agreements contemplated by this Agreement to be entered into at Closing, and the performance of the transactions contemplated hereunder and thereunder do not and will not (i) conflict with or result in a breach of any provision of the certificate of formation and the limited liability company agreement of the Company; (ii) result in a violation or breach of or constitute a default (or an event which, with or without notice or lapse of time or both, would constitute a default) under, or result in the termination, modification or cancellation of, or the loss of a benefit under or accelerate the performance required by, or result in a right of termination, modification, cancellation or acceleration under the terms, conditions or provisions of any contract, Business Permit or other instrument of any kind to which Seller, or the Company is now a party or by which any of their respective Assets may be bound or affected; or (iii) violate any law, order, writ, injunction, decree, statute, treaty, rule or regulation applicable to Seller or the Company or any of their respective Assets.

Section 3.2. Ownership of Interests.  Seller is the sole lawful record and beneficial owner of the Interests and owns the Interests free and clear of all Encumbrances whatsoever and is the sole member of the Company.  None of Seller's wife, nor any current or prior family members of Seller, has any right, title or interest in or to the Company or the equity, debt or assets thereof. Upon the delivery of the Interests by Seller to Purchaser in the manner contemplated under Article II, Purchaser will acquire the beneficial and legal title to the Interests, free and clear of all Encumbrances.  There are no outstanding options, warrants or other rights of any kind to acquire from Seller or the Company any equity of the Company or securities convertible into or exchangeable for, or which otherwise confer on the holder thereof any right to acquire from Seller any such equity, nor is Seller or the Company committed to issue any such option, warrant, right or security.

Section 3.3. Organization and Authority of the Company.  The Company is a limited liability company validly existing and in good standing under the laws of the State of New Jersey and has all necessary limited liability power and authority to carry on the Business and to own, use and lease its Assets. The Company is duly qualified, licensed or admitted to do business and in good standing in every jurisdiction in which such qualification, licensing or admission is necessary because of the nature of the property owned, leased or operated by it or the nature of the business conducted by it (each of which jurisdictions with respect to the Company is listed in Section 3.3 of the Seller Disclosure Schedule). Seller has delivered to Purchaser complete and correct copies of the certificate of formation, limited liability company agreement and other constituent documents, corporate minute books and ledgers of the Company as currently in effect.

Section 3.4. Capitalization.  The Interests constitute all of the issued and outstanding equity interests of the Company as of the date hereof.  All of the Interests have been validly issued and are fully paid and non-assessable.

Section 3.5. Subsidiaries and Equity Investments.  The Company does not have, directly or indirectly, any equity interest in any other Person.  The Company has no, and has never had any, Subsidiaries.

Section 3.6. <u>Financial Statements</u>. <u>Section 3.6 of the Seller Disclosure Schedule</u> sets forth the balance sheet of the Company for each of the three years ended as of December 31, 2011, 2012, and 2013 and the related statements of income, cash flows and members' equity for the periods then ended, and the unaudited balance sheet of the Company as of July 31, 2014 and the related unaudited statements of income, cash flows and members' equity for the period then ended (collectively, the "<u>Financial Statements</u>"). The Financial Statements were prepared in accordance with GAAP on a basis consistent with prior periods and fairly present, in all material respects, the financial position and results of operations of the Company as of their respective dates and for the respective periods presented (subject, in the case of the unaudited portions of the Financial Statements, to the absence of certain footnote disclosures otherwise required by GAAP and which will not be material in amount or effect).

Section 3.7. <u>Absence of Undisclosed Liabilities</u>. There are no liabilities or obligations of or relating to the Company of any nature, whether accrued, contingent or otherwise, that would be required under GAAP to be set forth on a balance sheet of the Company or in the notes thereto, and to Seller's Knowledge, there is no existing condition, situation or set of circumstances that reasonably could be expected to result in such a liability or obligation, except for liabilities or obligations reflected in the Balance Sheet or as set forth in <u>Section 3.7 of the Seller Disclosure Schedule</u>. The certificate delivered pursuant to Section 2.6(e) contains a true and correct description of all outstanding amounts due and any outstanding defaults or other liabilities or amounts owed as of immediately following consummation of the Closing, by Company or Seller or their Affiliates under or with respect to the Line of Credit extended by Lender.

Section 3.8. <u>Absence of Certain Changes or Events</u>. Since the date of the Balance Sheet, (a) there has not been any event, circumstance, change or effect that has had or reasonably could be expected to have a Business Material Adverse Effect; and (b) the Business of the Company has been conducted only in the ordinary course.

Section 3.9. <u>Tax Matters</u>.

(a) The Company is, and, from the time the interests in the Company became solely owned by the Seller, on September 30, 2014, has always been, properly treated for U.S. federal, state and local Tax purposes as a "disregarded entity" the assets, liabilities, income and expenses of which are treated for such purposes as assets, liabilities, income and expenses of the Seller. From the Company's formation and at all times prior to the interests in the Company being solely owned by the Seller on the date referenced in the preceding sentence, the Company has been properly treated as a partnership for U.S. federal, state and local Tax purposes (except for a brief period on and after its formation date when it was treated as a "disregarded entity" wholly owned by the Seller, prior to having multiple owners and being treated as a partnership). The Company, the Seller and any previous holder of interests in the Company have filed all Tax Returns, and otherwise only taken positions before Tax Authorities, that are consistent with the treatment described in the immediately preceding two sentences.

(b) All Tax Returns required to be filed with any Tax Authority by or on behalf of the Company have been timely filed in accordance with applicable law, and all such Tax Returns were correct and complete. All Taxes shown as due and payable on such Tax Returns have been timely paid to the appropriate Tax Authority. No claim has been made by a Tax Authority in a jurisdiction where Tax Returns are not filed by or on behalf of the Company that the Company is or may be subject to taxation by that jurisdiction.

(c) The Company is not delinquent in the payment of any Tax or has not requested an extension of time to file a Tax Return and not yet filed such return. No audit or other administrative proceeding is pending or threatened, and no judicial proceeding is pending or threatened, that involves

any Tax or Tax Return filed or paid by or on behalf of the Company.  Section 3.9(c) of the Seller Disclosure Schedule sets forth all closing agreements and Tax rulings requested or received from any Tax Authority with respect to the Company.

(d) The Company is not party to any tax sharing agreement or arrangement, nor otherwise obligated to pay Taxes of another Person by statute, by contract, as transferee, as successor or otherwise.

(e) The Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, holder of any interest in the Company or other third party.

(f) The Company is not a direct or indirect beneficiary of a guarantee of Tax benefits or any other arrangement that has the same economic effect (including an indemnity from a seller or lessee of property, or other insurance) with respect to any transaction or Tax opinion.  The Company is not a party to any understanding or arrangement described in Section 6111(d) or Section 6662(d)(2)(C)(iii) of the Code or a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(g) None of the assets of the Company are (i) tax exempt use property under Section 168(h) of the Code; (ii) tax-exempt bond financed property under Section 168(g) of the Code; (iii) limited use property under Revenue Procedure 2001-28; or (iv) treated as owned by any other person under Section 168 of the Code.  The Company does not own an interest in real property in any jurisdiction in which a Tax is imposed, or the value of the interest is reassessed, on the transfer of an interest in real property and which treats the transfer of an interest in an entity that owns an interest in real property as a transfer of the interest in real property.

(h) The Seller is a United States person as such term is defined for purposes of Sections 1445 and 7701(a)(30) of the Code.

Section 3.10.    Employee Benefits.

(a) Section 3.10 of the Seller Disclosure Schedule contains a true and complete list of each Company Plan.  None of the Company or any ERISA Affiliate has any obligation to change or otherwise modify any existing Company Plan or program or to establish any new plan or program.

(b) Each Company Plan is, and its administration (including with respect to reporting and disclosure) is and at all times in the past has been in compliance with, and none of Seller or the Company has received any claim or notice that any such Company Plan is not in compliance with, the terms of the applicable Company Plan, ERISA, the Code (including all tax rules compliance with which is required for any intended favorable tax treatment) or any and all other applicable laws.

(c) All contributions, premiums and other payments required by law or any Company Plan to have been made with respect to any such Company Plan have been made by the due date thereof.

(d) Each of the Company Plans that is intended to be tax-qualified under Section 401(a) of the Code has been determined by the IRS to be so qualified and such determination has not been modified, revoked or limited, and no circumstances have occurred that would adversely affect the tax-qualified status of any such Plan.

(e) Neither the Company nor any ERISA Affiliate currently sponsors, contributes to, maintains or has any liability (whether contingent or otherwise) under (i) a "multiemployer plan" (as

defined in Section 4001(a)(3) of ERISA) or (ii) an employee benefit plan that is or was subject to Part 3 of Subtitle B of Title I of ERISA, or Section 412 of the Code, or Title IV of ERISA, nor have any of them ever done so.

(f)   Each Company Plan or other contract, plan, program, agreement or arrangement that is a "nonqualified deferred compensation plan" (within the meaning of Section 409A(d)(1) of the Code) has, in all material respects, been in documentary and operational compliance with Section 409A of the Code and all applicable IRS guidance promulgated thereunder. The Company does not have any indemnity obligation for any Taxes imposed under Sections 4999 or 409A of the Code.

(g)   There is no suit, action, dispute, claim, arbitration or legal, administrative or other proceeding or governmental investigation pending, or threatened, alleging any breach of the terms of any Company Plan or of any fiduciary duties thereunder or violation of any applicable law with respect to any such Plan.

(h)   The Company has made available to Purchaser true, complete and correct copies, to the extent applicable, of: (i) each material Company Plan (or, in the case of any unwritten Company Plans, descriptions of all material terms thereof); (ii) the most recent annual reports on Form 5500 filed with the IRS with respect to each Company Plan (if any such report was required); (iii) the most recent summary plan description for each Company Plan for which such a summary plan description is required; (iv) each trust agreement, group annuity contract or other funding and financing arrangement relating to any Company Plan; and (v) the most recent determination letter or opinion received from the IRS with respect to each Company Plan that is intended to be qualified under Section 401 of the Code.

(i)   Except as set forth on Section 3.10(i) of the Seller Disclosure Schedule, neither the execution or delivery of this Agreement nor the consummation of the transaction contemplated hereunder will, either alone or in conjunction with any other event (whether contingent or otherwise): (i) result in any payment or benefit becoming due or payable, or required to be provided, to any current or former director, employee, advisor, consultant or independent contractors of the Company; (ii) result in the forgiveness of any indebtedness of any current or former director, employee, advisor, consultant or independent contractor of the Company to the Company; (iii) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, employee, advisor, consultant or independent contractor; or (iv) result in the acceleration of the time of payment, vesting, distribution or funding of any such benefit or compensation.

Section 3.11.   Employment Matters.

(a)   Section 3.11(a) of the Seller Disclosure Schedule sets forth: (a) the name, the country where such person is based and where the services are primarily performed and current annual salary and any bonus or commitment to pay any other amount or benefit in connection with a termination of employment, if applicable, of all officers, independent contractors, directors and employees of the Company and (b) the names and titles of all directors and officers of the Company and of each trustee, fiduciary or plan administrator of each Company Plan.

(b)   Except as set forth in Section 3.11(b) of the Seller Disclosure Schedule: (i) there is no labor strike, dispute, work stoppage or lockout pending, or, to Seller's Knowledge, threatened, against the Company; (ii) except as set forth on Section 3.11(b) of the Seller Disclosure Schedule, there is no collective bargaining agreement or other contract with any union, or work rules or practices agreed to with any union or similar employee representative, binding on the Company with respect to any employees of the Company.

(c) Except as set forth in Section 3.11(c) of the Seller Disclosure Schedule, the Company is in all material respects in compliance with all applicable laws relating to labor and employment, including but not limited to applicable laws relating to discrimination, disability, labor relations, hours of work, payment of wages and overtime wages, characterization of workers as employees or independent contractors, pay equity, immigration, workers compensation, working conditions, employee representation, occupational safety and health, family and medical leave, employee terminations and mass layoff, salary freeze and data privacy.

Section 3.12.   Litigation.   There are no claims, suits, proceedings, actions, investigations, oppositions, challenges, cancellation proceedings or changes pending or, to Seller's Knowledge, threatened against or affecting Seller, the Company or relating to or affecting its Assets (including any claims by current or former officers, directors and employees of the Company). There are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Company.

Section 3.13.   No Violation of Law; Governmental Authorization.

(a) None of the Company nor its Affiliates is or in the past three years has been in default under or in violation of, or has been charged with any violation of, any law, statute, order, rule, regulation, ordinance or judgment (including any applicable environmental, labor, export control or foreign corrupt practices law, ordinance, decree or regulation) of any Governmental Authority, in any material respect, to which the Company or its Affiliates or any of their Assets is or was subject.

(b) The Company has obtained and holds all Permits, licenses, franchises, variances, exemptions, orders and other governmental authorizations, certificates, consents and approvals necessary to conduct the Business and operate the Assets as presently conducted and operated by Seller and the Company and to own the Assets (collectively, the "Business Permits"). All the Business Permits are listed in Section 3.13(b) of the Seller Disclosure Schedule. All the Business Permits have been legally obtained and maintained and are in full force and effect. None of the Company nor any of its Affiliates or any of the Assets is in violation of or is being operated in violation of the terms of any Business Permit.

(c) Except as set forth in Section 3.13(c) of the Seller Disclosure Schedule, neither the execution and delivery of this Agreement nor the performance of any of the transactions contemplated hereby will: (i) require any assignment, consent, waiver or other action in respect of any Business Permit; (ii) result in the termination or modification of any Business Permit; or (iii) result in a need for additional Permits.

Section 3.14.   Title to Assets; Encumbrances.   The Company has good and valid title to all of the Assets, free and clear of all Encumbrances.

Section 3.15.   Entire Business; Sufficiency of Assets.   The Assets constitute all of the assets, properties and rights used in the conduct of the Business as conducted by Seller and his Affiliates (which includes the Company as at the date of this Agreement), in all material respects. Immediately following the Closing, neither Seller nor any of his Affiliates will own or lease any assets, properties or rights that are used in the conduct of the Business as conducted by Seller and his Affiliates (which includes the Company as at the date of this Agreement), in all material respects. There are no facilities, services, assets or properties shared with any other Person that are used by the Company in the conduct or operation of the Business.

Section 3.16.   Insurance.   Section 3.16 of the Seller Disclosure Schedule sets forth a complete and correct list of all policies held by or on behalf of the Company.

Section 3.17.   <u>Contracts and Other Agreements Section 3.17 of the Seller Disclosure Schedule</u> sets forth all Company Contracts. To Seller's Knowledge, the Company Contracts are binding on the counterparties thereto and none of such counterparties have indicated an intent to terminate any of such contracts early or not renew at the end of the applicable term. All Company Contracts were entered into on an arms-length basis.

Section 3.18.   <u>Inventory</u>.   The Inventory reflected on the balance sheets included in the Financial Statements was properly stated therein at the lesser of cost or fair market value determined in accordance with GAAP consistently applied. The Inventory is owned free and clear of all Encumbrances, other than in favor of the Lender in the amount as specified in the evidence delivered by Seller pursuant to <u>Section 2.6(e)</u> on the Closing, and is Merchantable, except for immaterial defects consistent with past practice of the Company and similarly situated industry participants. <u>Section 3.18 of the Seller Disclosure Schedule</u> sets forth all orders by or on behalf of the Company for wine which has not yet been physically delivered into Company inventory.

Section 3.19.   <u>Intellectual Property</u>.

(a) <u>Section 3.19(a) of the Seller Disclosure Schedule</u> sets forth a true, complete and accurate list of all Intellectual Property (other than trade secrets, know-how and goodwill attendant to the Intellectual Property and other intellectual property rights not reducible to schedule form). All registrations with and applications to Governmental Authorities in respect of the Intellectual Property are valid and in full force and effect.

(b) The Company, as applicable, is the sole and exclusive owner of all right, title and interest in and to the Intellectual Property, free and clear of all Encumbrances. To Seller's Knowledge, none of the Intellectual Property, nor the conduct of the Business infringes upon or misappropriates the rights of any other person nor is infringed upon or misappropriated by any other person or its property.

Section 3.20.   <u>Real Property</u>.

(a) <u>Section 3.20 of the Seller Disclosure Schedule</u> contains a true and correct list of each parcel of real property leased, subleased or occupied to or by the Company (the "<u>Leased Real Property</u>") and includes the parties to such lease or sublease, any amendments thereto, the expiration date of such lease or sublease.

(b) The Company has valid leasehold interests in all Leased Real Property and the Company is in possession of each parcel of Leased Real Property, and in each case such parcel is free and clear of all Encumbrances. The Company, as applicable, has such rights of ingress and egress with respect to such Leased Real Property, buildings, structures, facilities, fixtures and other improvements as are required to conduct the applicable portions of the Business in a safe, efficient and lawful manner consistent with past practice. The Company has a valid and subsisting leasehold estate in and the right to quiet enjoyment of the Leased Real Property for the full term of the lease of such properties.

Section 3.21.   <u>Bank and Brokerage Accounts; Investment Assets</u>.   <u>Section 3.21 of the Seller Disclosure Schedule</u> sets forth (a) a true and complete list of the names and locations of all banks, trust companies, securities brokers and other financial institutions at which the Company has an account or safe deposit box or maintains a banking, custodial, trading or other similar relationship; (b) a true and complete list and description of each such account, safe deposit box and relationship, indicating in each case the account number and the names of the respective officers, employees, agents or other similar representatives of the Company, having signatory power with respect thereto.

Section 3.22.   <u>Brokers</u>.  No agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser or any of its Subsidiaries could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of his Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

Section 4.1. <u>Organization and Qualification</u>.   Purchaser is a limited liability company validly existing and in good standing under the laws of the State of New York and has all necessary limited liability power and authority to carry on its business as now being conducted and to own, use and lease its Assets. Purchaser is duly qualified, licensed or admitted to do business and in good standing in every jurisdiction in which such qualification, licensing or admission is necessary because of the nature of the property owned, leased or operated by it or the nature of the business conducted by it.

Section 4.2. <u>Authority; Non-Contravention; Approvals</u>.

(a)  Purchaser has all requisite limited liability power and authority to execute and deliver this Agreement and to perform the transactions contemplated by this Agreement.

(b)  The execution and delivery of this Agreement and the performance by Purchaser of the transactions contemplated by this Agreement have been approved by the management committee of Purchaser and no other corporate proceedings on the part of Purchaser are necessary to authorize the execution and delivery of this Agreement and the performance by Purchaser of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery of this Agreement by Seller, constitutes valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

Section 4.3. <u>Sufficiency of Funds</u>. Purchaser has and will have sufficient funds to make the payments contemplated by Section 2.2(a) - (d) hereof and any adjustments thereto contemplated by Section 2.7.

Section 4.4. <u>Brokers</u>.  No agent, broker, investment banker, financial advisor or other firm or Person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser.

## ARTICLE V

## COVENANTS

Section 5.1. <u>Use of Name</u>.  Seller agrees, for itself and his Affiliates, that from and after the Closing none of them will use the name "Margate Wine & Spirit Company" or "Margate Wine and Spirit Company" or any abbreviation of or derivation from that name or any name similar to it in any form

whatsoever, including in respect of advertising and promotional materials except as provided for in this Agreement.

Section 5.2. Transfer Taxes. All transfer, registration, stamp, documentary, sales, use and similar Taxes (including all applicable real estate transfer or gains Taxes and transfer Taxes), any penalties, interest and additions to Tax, and fees incurred in connection with the transactions contemplated by this Agreement shall be the responsibility of and be timely paid by Seller. Seller and Purchaser shall cooperate in the timely making of all filings, returns, reports and forms as may be required in connection therewith.

Section 5.3. Non-Competition.

(a) From the date of this Agreement and for a period of two years after the last date that a payment is made by Purchaser to Seller under and consistent with the terms of Article II hereof, Seller will not, and will cause his Affiliates not to, directly or indirectly anywhere in the United States and in any other jurisdictions in which the Company or the Business (whether operated as a standalone entity or as part of the business of Purchaser) operates, (i) engage in, own any interest in, invest in, lend funds to, or provide any management, consulting, financial, administrative or other services to any business that competes in any material respect with the Company or the Business (whether operated as a standalone entity or as part of the business of Purchaser) directly or indirectly in any manner, (ii) knowingly solicit, sell or attempt to sell (or act as intermediary or wholesaler or distributor of) the brands, goods and services offered by the Company or the Business (whether operated as a standalone entity or as part of the business of Purchaser), (iii) disclose any material confidential or non-public information regarding the Company or the Business (whether operated as a standalone entity or as part of the business of Purchaser) to any third party, or (iv) directly or indirectly, knowingly solicit or encourage to leave employ or contract or offer to employ or contract with any person who is (or was during the previous 12 months) an employee of the Company (or any of its successors) or the Business (whether operated as a standalone entity or as part of the business of Purchaser); *provided, however,* that notwithstanding the foregoing, Seller and his Affiliates may own, directly or indirectly, solely as an investment, securities of any Person that are traded on any national securities exchange or Nasdaq if Seller (alone or collectively with his Affiliates) (1) is not a controlling Person of, or a member of a group that controls such Person and (2) does not, directly or indirectly, own two percent or more of any class of securities of such Person.

(b) The parties hereto recognize that the laws and public policies of the various states of the United States may differ as to the validity and enforceability of covenants similar to those set forth in this Section 5.3. It is the intention of the parties that the provisions of this Section 5.3 be enforced to the fullest extent permissible under the laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such laws or policies) of any provisions of this Section 5.3 shall not render unenforceable, or impair, the remainder of the provisions of this Section 5.3. Accordingly, if any provision of this Section 5.3 shall be determined to be invalid or unenforceable, such invalidity or unenforceability shall be deemed to apply only with respect to the operation of such provision in the particular jurisdiction in which such determination is made and not with respect to any other provision or jurisdiction.

(c) The parties to this Agreement acknowledge and agree that any remedy at law for any breach of the provisions of this Section 5.3 would be inadequate, and Seller hereby consents to the granting by any court of an injunction or other equitable relief, without the necessity of actual monetary loss being proved, in order that the breach or threatened breach of such provisions may be effectively restrained.

(d)  The parties agree that the restrictions in Section 5.1 and Section 5.3(a) shall terminate if (i) Purchaser is in breach of its obligations to pay the Installments in accordance with Section 2.2 and such breach is not cured following thirty (30) days written notice from Seller to Purchaser; and (ii) Seller is no longer providing services to the Business or the Company pursuant to Section 5.4 of this Agreement.

Section 5.4. Seller Consulting; Further Assurances; Post-Closing Cooperation; Insurance.

(a)  During the Payment Term, and excluding any periods of disability, vacation and sick leave taken by Seller to the extent consistent with Seller's past practice, Seller will devote Seller's full business time and reasonable commercial efforts to conduct of the Business as operated by Purchaser (to the extent substantially consistent with manner of operation in the 12 months prior to the date hereof); provided, that nothing herein shall preclude Seller from continuing to serve on the boards of directors or trustees, as applicable, of the business corporations or charitable organizations, as applicable, listed on Section 5.4(a) of the Seller Disclosure Schedule hereto or, subject to the prior written approval of Purchaser, from accepting appointment to serve on any board of directors or trustees of any business corporation or charitable organization; provided in each case, and in the aggregate, that such activities do not conflict or interfere in more than a *de minimis* way with the performance of Seller's duties hereunder or violate Section 5.3.  While Seller is participating in the operation of the Business as contemplated by this Section 5.4(a),  he shall be entitled to receive and the Company shall pay (a) an annual payment of $52,000 (the "Draw"), (b) the insurance and other benefits as and for the terms specified on Section 5.4(a) of the Seller Disclosure Schedule; provided that Purchaser shall be entitled to substitute health and dental plans which provide substantially similar coverage, and (c) all reasonable and necessary out-of-pocket business, travel, including business class international and transcontinental air travel, and entertainment expenses incurred by Seller in the performance of the duties and responsibilities hereunder, subject to Purchaser's normal policies and procedures for expense verification and documentation.  Purchaser and Seller agree that the rights created by this Section 5.4(a) are contractual in nature and not intended to create an equity interest in the Company or Purchaser. Seller is not authorized to and shall not take any action on behalf of the Company, including make any financial commitment or place or accept orders of any products (except upon the prior written request of Purchaser) until Purchaser and Seller have mutually agreed in good faith written guidelines outlining Seller's authority to act on behalf of the Business, and thereafter, Seller shall comply with such guidelines.

(b)  From time to time after the Closing, without additional consideration, each of the parties hereto will (or, if appropriate, cause their Affiliates to) execute and deliver such further instruments and take such other action as may be necessary to make effective the transactions contemplated by this Agreement.  If any party to this Agreement shall following the Closing have in its possession any asset or right that under this Agreement should have been delivered to the other, such party shall promptly deliver such asset or right to the other.

(c)  Following the Closing, Seller will afford Purchaser and its representatives (i) such access as Purchaser may reasonably request to all books, records and other data and information, including any information from employees of Seller and his Affiliates, relating to the Company and (ii) the right to make copies and extracts therefrom.  Further, each party agrees for a period extending seven years after the Closing Date not to destroy or otherwise dispose of any such books, records and other data unless such party shall first offer in writing to surrender such books, records and other data to the other party and such other party shall not agree in writing to take possession thereof during the ten-day period after such offer is made.

(d)  Purchaser, or a parent thereof, shall, for a period of six months, provide or cause to be provided to each person specified on Section 5.4(d) of the Seller Disclosure Schedule who is an employee of the Business that resides in the United States of America hereof (a "Continuing Employee"),

during the term of their employment, medical, life insurance and disability benefits, that, as determined in Purchaser's discretion, are substantially comparable to those provided under the Company Plans as in effect as of Closing which disclosed (or cross referenced) on Section 5.4(d) of the Seller Disclosure Schedule; provided that Purchaser is able to continue to offer such benefits to the Continuing Employees upon substantially similar terms and at substantially similar costs as provided by the Company immediately prior to the Closing.  Purchaser, or a parent thereof, shall use its commercially reasonable efforts to: (i) waive any applicable pre-existing condition exclusions and waiting periods with respect to participation and coverage requirements in any replacement or successor welfare benefit plan of the Company that an employee of the Company is eligible to participate in immediately following the Closing to the extent such exclusions or waiting periods were inapplicable to, or had been satisfied by, such employee immediately prior to the Closing under the relevant Company Plan in which such employee participated; and (ii) provide each such employee with credit for any co-payments and deductible paid prior to the Closing (to the same extent such credit was given under the analogous Company Plan prior to the Closing) in satisfying any applicable deductible or out-of-pocket requirements.

Section 5.5. Lease.  Promptly following Closing, Seller and his Affiliates and Purchaser shall negotiate in good faith a standard form of lease of the primary business premises of the Company located in Northfield, New Jersey, including a monthly rent of $1,500 and a 3% escalator clause and under which Purchaser shall bear all costs of the leased premises, including but not limited to, insurance, taxes, utilities and maintenance (a triple net lease), all on terms as agreed by the parties.

Section 5.6. Line of Credit.  Within ninety (90) days after the Closing, Purchaser agrees to pay off the outstanding portion of the Line of Credit in the full amount due and payable as of the date of such pay off and such payoff shall not constitute an offset, deduction or adjustment from the Purchase Price. Purchaser shall deliver any payoff letters with respect to the full satisfaction of the obligations owed under the Line of Credit and any necessary UCC authorizations or other releases as may be reasonably required to evidence the satisfaction of such debt owed under the Line of Credit, in such form as reasonably satisfactory to Seller.

## ARTICLE VI

## TAX MATTERS

Section 6.1. Covenants.

(a) Purchaser shall prepare in accordance with applicable law and timely file the Tax Returns (if any) of the Company due after the date of this Agreement for Pre-Closing Tax Periods or for Straddle Periods.  The Seller shall (and shall cause any other holder of an interest in the Company during the Tax period covered by the applicable Tax Return of the Company to) (i) cooperate and take all steps (including signing any applicable powers of attorney) requested by Purchaser in order to prepare and file such Tax Returns of the Company and (ii) take positions on Seller's (and such other holder's, as applicable) Tax Returns that are consistent with such Tax Returns of the Company.

(b) Seller and Purchaser agree that for Tax purposes, the transaction shall be treated as a sale of the assets of the Company by Seller and that the Purchase Price shall be allocated among the assets of the Company in accordance with Exhibit 6.1(b) to this Agreement.  Seller and Purchaser shall, and shall cause their Affiliates to, file all Tax Returns (including Internal Revenue Service 8594) in a manner consistent with such allocation.

(c) The Seller shall cause the Company to make an election under Section 754 of the Code, as an attachment to the Company's federal partnership Tax Return for 2014.

Section 6.2. <u>Cooperation on Tax Matters</u>.  Purchaser and Seller shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the preparation and filing of any Tax Return and any audit or other administrative or judicial proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

Section 6.3. <u>Tax Indemnity</u>.

(a)  Seller hereby indemnifies the Purchaser Indemnified Parties (including the Company) against and agrees to hold them harmless from any (w) Tax of the Company related to a Pre-Closing Tax Period or to the portion of a Straddle Period ending on the date of this Agreement, (x) (i) Taxes of the Seller or another Person for which the Company is liable by reason of a transaction, status or event occurring or existing prior to the Closing, and (ii) Taxes of the Seller or another Person for which Purchaser or another Purchaser Indemnified Party is liable as a result of acquiring the Company pursuant to this Agreement, (y) Tax of the Company resulting from a breach of the provisions of Sections 3.9 or Article VI, and (z) liabilities, costs, expenses (including, without limitation, reasonable expenses of investigation and attorneys' fees and expenses), losses, damages, assessments, settlements or judgments arising out of or incident to the imposition, assessment or assertion of any Tax described in (w), (x) or (y) (the sum of (w), (x), (y) and (z) being referred to herein as a "Tax Loss");  provided, that the amount otherwise recoverable under this Section 6.3 in respect of any Tax Loss shall be reduced by the amount, if any, of such Tax Loss set forth as a current liability on the Closing Net Working Capital as finally determined under Section 2.7 of this Agreement.

(b)  For purposes of this Section 6.3, in the case of any Taxes that are payable for a Straddle Period, the portion of such Tax related to the portion of such Tax period ending on the date of this Agreement shall (x) in the case of any Taxes other than gross receipts, sales or use Taxes and Taxes based upon or related to income, be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on and including the date of this Agreement and the denominator of which is the number of days in the entire Tax period, and (y) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, be deemed equal to the amount which would be payable if the relevant Tax period ended on and including the date of this Agreement.  All determinations necessary to give effect to the allocation set forth in the foregoing clause (y) shall be made in a manner consistent with prior practice of the Company.

(c)  Not later than 30 days after receipt by Seller of written notice from Purchaser stating that any Tax Loss has been incurred by any of the Persons specified in Section 6.3(a) and the amount thereof, Seller shall discharge its indemnification obligation with respect to such Tax Loss by paying to Purchaser an amount equal to the amount of such Tax Loss.  Notwithstanding the foregoing, if Purchaser provides Seller with written notice of a Tax Loss at least 30 days prior to the date on which the relevant Tax Loss is required to be paid by Purchaser or any other Person specified in Section 6.3(a), then within that 30-day period Seller shall discharge its indemnification obligation under this Section 6.3 with respect to such Tax Loss by making payments to the relevant Tax Authority or Purchaser, as directed by Purchaser, in an aggregate amount equal to the amount of such Tax Loss.  The payment by a Purchaser or any of the other Persons specified in Section 6.3(a) of any Tax Loss shall not relieve Seller of its obligation under this Section 6.3.

(d)  Purchaser agrees to give prompt notice to Seller of any Tax Loss or the assertion of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought hereunder which Purchaser deems to be within the ambit of this Section 6.3 (specifying with

AMR-492753-v10
NEW

reasonable particularity the basis therefor) and will give Seller such information with respect thereto as Seller may reasonably request.

## ARTICLE VII

## SURVIVAL; INDEMNIFICATION

Section 7.1. Survival of Representations, Warranties, Covenants and Agreements.

(a) The representations and warranties of Seller and Purchaser contained in this Agreement will survive the Closing: (a) indefinitely with respect to the representations and warranties contained in Sections 3.1(a) Authority, 3.2 Ownership of Interests, 3.3 Organization and Authority of the Company, 3.4 Capitalization, 3.14 Title to Assets; Encumbrances, 3.22 Brokers and 4.1 Organization and Qualification, 4.3 Sufficiency of Funds and 4.4 Brokers; (b) until 60 calendar days after the expiration of all applicable statutes of limitation (including all periods of extension, whether automatic or permissive) with respect to the matters contained in Sections 3.9 Tax Matters, 3.10 Employee Benefits and 3.11 Employment Matters; and (c) until the 18 month anniversary of the date of this Agreement in the case of all other representations and warranties; provided, however, that any representation, warranty that would otherwise terminate in accordance with clause (b) or (c) above will continue to survive if a notice of a claim shall have been given under this Article VII on or prior to the date on which it otherwise would terminate, until the related claim for indemnification has been satisfied or otherwise resolved as provided in this Article VII. Except as otherwise expressly provided in this Agreement, each covenant hereunder shall survive without limit.

(b) For purposes of this Agreement, a party's representations and warranties shall be deemed to include such party's Disclosure Schedule and all other documents or certificates delivered by or on behalf of such party in connection with this Agreement. No party's rights hereunder (including rights under this Article VII) shall be affected by any investigation conducted by or any knowledge acquired (or capable of being acquired) by such party at any time, whether before or after the execution or delivery of this Agreement and each party acknowledges that the other party has bargained for and is relying on the counterparty's representations and warranties hereunder. Each party has had an opportunity to review this Agreement with advice of such party's attorney and have had the meaning of the provisions explained to such party's satisfaction.

Section 7.2. Indemnification of Purchaser.  Seller shall indemnify and hold harmless Purchaser, its Affiliates and their respective successors, permitted assigns, shareholders, managers, members, officers, directors and employees (collectively, the "Purchaser Indemnified Parties") from and against any and all Losses that may be asserted against, or paid, suffered or incurred by any Purchaser Indemnified Party (whether or not due to third party claims) that, directly or indirectly, arise out of, result from, are based upon or relate to: (a) any inaccuracy in or any breach of, as of the date of this Agreement, any representation and warranty made by Seller in this Agreement or in any statement or certificate delivered by Seller pursuant to this Agreement; provided, however, that if any such representation or warranty is qualified in any respect by materiality or Business Material Adverse Effect, for purposes of this clause (a) such materiality or Business Material Adverse Effect qualification will in all respects be ignored; (b) any failure by Seller to duly and timely perform or fulfill any of its covenants or agreements required to be performed by Seller under this Agreement or any document delivered by Seller pursuant to this Agreement; and (c) the Excluded Liabilities.

Section 7.3. Indemnification of Seller .  Purchaser shall indemnify and hold harmless Seller and his successors and permitted assigns  (collectively the "Seller Indemnified Parties") from and against any and all Losses that may be asserted against, or paid, suffered or incurred by any Seller Indemnified Party

(whether or not due to third party claims) that, directly or indirectly, arise out of, result from, are based upon or relate to: (a) the inaccuracy, as of the date of this Agreement, of any representation or warranty made by Purchaser in this Agreement or in any statement or certificate delivered by Seller pursuant to this Agreement; *provided, however,* that if any such representation or warranty is qualified in any respect by materiality, for purposes of this paragraph such materiality qualification will in all respects be ignored; and (b) any failure by Purchaser to perform or fulfill any of its covenants or agreements required to be performed by Purchaser under this Agreement.

Section 7.4. Limitations; Sole Remedy.   The maximum liability of Seller under clause (a) of Section 7.2 shall not exceed $620,000 (the "Indemnification Cap").   Notwithstanding the foregoing, the Indemnification Cap shall not apply to any claim for indemnity based on any of Sections 3.1(a) Authority, 3.2 Ownership of Interests, 3.3 Organization and Authority of the Company, 3.4 Capitalization, 3.13(b) No Violation of Law; Governmental Authorization, 3.14 Title to Assets; Encumbrances or 3.22 Brokers, or based on actual fraud or a knowing and intentional misrepresentation. Except in the case of actual fraud or a knowing and intentional misrepresentation, a claim for indemnification under Article VI, this Article VII or specific performance or equitable relief as permitted hereunder, shall be the sole remedy available to a party for the other party's breach hereof.

Section 7.5. Method of Asserting Claims.   If an Indemnified Party intends to seek indemnification under this Article VII, it shall promptly notify the Indemnifying Party in writing of such claim.   The failure to provide such notice will not affect any rights hereunder except to the extent the Indemnifying Party is materially prejudiced thereby.

Section 7.6. Indemnity Payments.   The parties agree that any indemnification payments made with respect to this Agreement shall be treated for all Tax purposes as an adjustment to the Purchase Price, unless otherwise required by law (including by a determination of a Tax authority that, under applicable law, is not subject to further review or appeal).   If an indemnification payment by law cannot be treated as an adjustment to Purchase Price, the Indemnifying Party will pay an amount to the Indemnified Party that reflects the hypothetical Tax consequences of the receipt or accrual of such indemnification payment, using the maximum applicable statutory rate (or, in the case of an item that affects more than one Tax, rates) of Tax and reflecting, for example, the effect of deductions available for Taxes such as state and local income Taxes.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1. Notices.   All notices, requests and other communications under this Agreement must be in writing and will be deemed to have been duly given upon receipt to the parties at the following addresses or facsimiles (or at such other address or facsimile for a party as shall be specified by the notice):

If to Seller:

    2800 Shore Road
    Northfield, New Jersey 08225
    Attention: Jonathan Shiekman
    Facsimile:

With a copy (which shall not constitute notice) to:

Pepper Hamilton LLP
620 Eighth Avenue
New York, New York 10018
Attention: James D. Rosener
Facsimile: (212) 808-2717

If to Purchaser:

Imperial Wine & Spirits LLC
255 West 36 Street
Suite 1103
New York, New York 10018
Attention: Cynthia Aaserod
Facsimile:

With a copy (which shall not constitute notice) to:

Clifford Chance US LLP
31 West 52nd Street
New York, New York 10019
Attention: Ivan Presant
Facsimile: (212) 878-8375

Section 8.2. Entire Agreement.  This Agreement and the exhibits and schedules hereto supersede all prior and contemporaneous discussions and agreements, both written and oral, among the parties with respect to the subject matter of this Agreement and constitute the sole and entire agreement among the parties to this Agreement with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements and understandings, written or oral, with respect to the subject matter hereof.

Section 8.3. Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each party will pay its own costs and expenses incurred in connection with the negotiation, execution and closing of this Agreement and the transactions contemplated by this Agreement.

Section 8.4. Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.  All remedies, either under this Agreement or by law or otherwise afforded, will be cumulative and not alternative.

Section 8.5. Amendment.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party to this Agreement.

Section 8.6. No Third-Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article VII.

Section 8.7. Assignment; Binding Effect.   Neither this Agreement nor any right, interest or obligation under this Agreement may be assigned by any party to this Agreement by operation of law or otherwise without the prior written consent of the other party to this Agreement and any attempt to do so will be void, except that Purchaser may assign any or all of its rights, interests and obligations under this Agreement to any Affiliate and to any successor or any purchaser of substantially all the assets of the Business (in whatever form such transaction is effected) and the rights of Seller may be assigned in the case of death or disability, pursuant to the laws of descent and distribution. Subject to the foregoing, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties to this Agreement and their respective successors and assigns.

Section 8.8. Specific Performance.   The parties hereto agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine, and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

Section 8.9. Invalid Provisions.   If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

Section 8.10.   GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD FOR THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

Section 8.11.   Jurisdiction.   The parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States District Court located in the County of New York for any lawsuits, actions or other proceedings arising out of or relating to this Agreement and agree not to commence any such lawsuits, actions or other proceedings except in such courts.  Each of the parties hereto hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding.  EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE PERFORMANCE OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

Section 8.12.   Counterparts.   This Agreement may be executed in any number of counterparts, all of which will constitute one and the same instrument.

Section 8.13.   Interpretation. The parties have participated jointly in negotiating and drafting this Agreement.  If an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

*[Signatures begin on the next page]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER:

By: _____
JONATHAN SHIEKMAN

PURCHASER

IMPERIAL WINE & SPIRITS LLC

By: _____
Name: CYNTHIA AASEROD
Title: Manager

## Exhibit 1.1(a)

### Debt

The line of credit from Parke Bank to the Company with an outstanding balance of US$528,370.04 as at the date of this Agreement.

Remainder of Exhibits and Disclosure
Schedules Not Included